**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No.:

GARY PETERSON, Derivatively on Behalf of VAIL RESORTS, INC.,

Plaintiff,

v.

ROBERT A. KATZ, D. BRUCE SEWELL, HILARY A. SCHNEIDER, PETER A. VAUGHN, SUSAN L. DECKER, MICHELE ROMANOW, NADIA RAWLINSON, IRIS KNOBLOCH, and REGINALD CHAMBERS,

Defendants,

-and-

VAIL RESORTS, INC., a Delaware Corporation,

Nominal Defendant.

---

**VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT FOR VIOLATION OF SECURITIES LAW, BREACH OF FIDUCIARY DUTY, AND UNJUST ENRICHMENT**

---

Plaintiff, by his attorneys, submits this Verified Stockholder Derivative Complaint for Violation of Securities Law, Breach of Fiduciary Duty, and Unjust Enrichment. Plaintiff alleges the following on information and belief, except as to the allegations specifically pertaining to plaintiff which are based on personal knowledge. This complaint is also based on the investigation of plaintiff's counsel, which included, among other things, a review of public filings with the U.S. Securities and Exchange Commission ("SEC") and a review of news reports, press releases, and other publicly available sources.

## NATURE AND SUMMARY OF THE ACTION

1. This is a stockholder derivative action brought by plaintiff on behalf of nominal defendant Vail Resorts, Inc. ("Vail" or the "Company") against certain of its officers and directors for violation of section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), breach of fiduciary duty, and unjust enrichment. These wrongs resulted in significant damages to Vail's reputation, goodwill, and standing in the business community, as well as exposing the Company to two federal antitrust class actions seeking treble damages and structural relief.

2. Vail, through its subsidiaries, is the largest mountain resort operator in the world. The Company built and pioneered the Epic Pass, a first-of-its-kind multi-mountain season pass that transformed the economics of North American skiing by moving buyers off single-day lift tickets and onto discounted, paid-in-advance, season-long commitments. The pricing of the Epic Pass and the Company's lift tickets is not a peripheral concern; it is the core of Vail's business. By the Company's own admission, its pass products generated approximately 65% of total lift revenue and approximately 75% of total visitation in fiscal 2025. No decision the Company makes carries greater consequence for its stockholders than how it prices that pass.

3. Because pricing is the engine of Vail's business, it was also a mission-critical risk that the Individual Defendants (as defined herein) had a non-delegable duty to monitor and to keep within the bounds of the law. They failed to do so. Beginning no later than January 2020, Vail and its horizontal competitors Alterra Mountain Company ("Alterra"), Boyne Resorts ("Boyne"),

and Powdr Corp. ("Powdr"),[1] working through the National Ski Areas Association ("NSAA")[2] and its data partner RRC Associates ("RRC"),[3] exchanged confidential, competitively sensitive information, including revenue, cost, capacity, and pricing data, and used that information to fix, raise, maintain, and stabilize the prices of destination ski products. Vail funneled its non-public figures to RRC at the NSAA's direction, and RRC compiled that data into benchmarking reports and consulting recommendations that Vail then used to set its prices at supracompetitive levels while sparing itself genuine competition. The scheme worked as designed, producing parallel, substantial, and lockstep price increases across the competitors' passes, lift tickets, rentals, and lessons.

4. Vail separately used punitive single-day lift-ticket prices to coerce consumers into the Epic Pass, setting day-ticket prices at its Destination Ski Resorts so high that purchasing access outside the Epic Pass ecosystem became economically irrational, and bundling access to its must-have destination resorts with access to regional ski areas that many consumers neither wanted nor used. The Company's own Chief Executive Officer ("CEO"), defendant Robert A. Katz ("Katz"), publicly and repeatedly claimed credit for this strategy, conceding to the *New York Times* that

---

[1] Vail, Alterra, Boyne, and Powdr are collectively referred to herein as the "Resort Conspirators."

[2] The NSAA is the industry trade association for ski resort owners and operators. It represents hundreds of resort and supplier members.

[3] RRC occupies a unique position as the primary data aggregator for the ski industry. In cooperation with the NSAA and its member resorts, RRC prepares annual reports addressing statistics and trends critical to the business of "Destination Ski Resorts." A Destination Ski Resort generally sits atop what the NSAA classifies as an "Extra-Large" ski mountain. RRC also provides exclusive access to granular, resort-level business data through consulting agreements with individual Destination Ski Resorts.

Vail's lift-ticket prices were "intentionally" aggressive and "pushed customers to buy Epic Passes," and telling the *Wall Street Journal* that the industry-wide transformation in lift-ticket pricing was one "that our company absolutely led."[4]

5. This conduct was no unforeseeable hazard. The Company's own Code of Ethics and Business Conduct (the "Code") contained a dedicated "Antitrust and Fair Competition" section that expressly prohibited "signaling future lift ticket or season pass pricing" and the exchange of pricing information with competitors "no matter how innocent or casual the exchange may be," and warned that "[t]here are no off-the-record discussions with competitors." The Company's own policy thus identified, and prohibited, the precise pricing signaling and competitor information exchange in which Vail was engaged. The Individual Defendants either knew that Vail was violating the antitrust laws and its own Code and failed to halt the conduct, or consciously disregarded the red flags it generated, including the participation of the Company's senior leadership in the trade-association gatherings and information exchange at the center of the scheme.

6. The Company must now face the legal consequences of the Individual Defendants' actions. In 2026, Vail was named as a defendant in two separate federal antitrust class actions, both filed in this District. On March 23, 2026, four skiers filed *Goloja, et al. v. Vail Resorts, Inc.,*

[4] Andrew Ross Sorkin et al., DealBook Newsletter, The New York Times (Dec. 12, 2025), available at https://www.nytimes.com/2025/12/12/business/dealbook/ellisonparamount-oracle-warner-bros-financing.html; *How Vail Changed the Economics of the Entire Ski Industry*, The Wall Street Journal (Feb. 26, 2026), available at https://www.wsj.com/video/series/in-depthfeatures/how-vail-changed-the-economics-of-the-entire-ski-industry/76B54497-21C5-4820-981E-CC3FB02C9970?mod=hp_lista_pos1.

*et al.*, No. 1:26-cv-01191 (the "*Goloja* Action"), challenging the Company's unlawful bundling and penalty pricing under section 1 of the Sherman Antitrust Act, 15 U.S.C. §1 (the "Sherman Act") and section 6-4-104 of the Colorado Antitrust Act of 2023, C.R.S.A. §6-4-104 (the "Colorado Act"). On August 5, 2026, three skiers filed *Green, et al. v. Vail Resorts, Inc., et al.*, No. 1:26-cv-03555 (the "*Green* Action"), challenging the horizontal price-fixing and information-exchange conspiracy under sections 1 and 3 of the Sherman Act.[5] Together, the Antitrust Actions expose Vail to treble damages on behalf of nationwide classes and to injunctive relief reaching the core of the Company's business, including structural remedies as severe as divestiture.

7. While causing and permitting this misconduct, the Individual Defendants also caused Vail to issue a materially false and misleading Proxy Statement. On October 23, 2024, Vail filed its Proxy Statement on Form DEF 14A (the "2024 Proxy") with the SEC, soliciting stockholder approval of the Vail Resorts, Inc. 2024 Omnibus Incentive Plan (the "2024 Plan"), the vehicle through which the Individual Defendants themselves would be compensated with equity awards. To secure that approval, the 2024 Proxy assured stockholders that the Company's fiduciaries were expected to comply with, and were complying with, the Code and its antitrust provisions; that the Board of Directors (the "Board") and its Audit Committee were adequately overseeing the Company's compliance with applicable laws; and that the 2024 Plan would "align employee and stockholder interests" and "link employee compensation with performance." Each of those representations was materially false and misleading. At the very time the 2024 Proxy was

---

[5] Together, the *Goloja* Action and the *Green* Action are referred to herein as the "Antitrust Actions."

solicited, the Company and its fiduciaries were engaged in the ongoing antitrust conspiracy described herein, and the 2024 Plan in fact rewarded the Individual Defendants with equity compensation keyed to performance metrics that the conspiracy had artificially inflated.

8. As a result of the materially false and misleading 2024 Proxy, Vail's stockholders approved the 2024 Plan, authorizing the equity compensation under which the Individual Defendants were enriched while they were breaching their fiduciary duties and exposing the Company to antitrust liability. The anticompetitive conduct also degraded the very product Vail sells, leaving its resorts overcrowded, understaffed, and beset by guest complaints, conditions serious enough to produce what guests dubbed the "lift line apocalypse" at Vail Mountain, Colorado, and labor unrest at Park City Mountain, Utah.

9. Through this action, plaintiff seeks to hold the Individual Defendants accountable for the substantial harm they have caused and will continue to cause the Company, to recover damages on the Company's behalf, to compel the disgorgement of the compensation the Individual Defendants obtained through their wrongful conduct, and to require Vail to reform its corporate governance and internal controls to prevent a recurrence of the wrongdoing described herein.

## JURISDICTION AND VENUE

10. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §1331 because plaintiff's claims raise a federal question under section 14(a) of the Exchange Act, 15 U.S.C. §78n(a), and SEC Rule 14a-9, 17 C.F.R. §240.14a-9, promulgated thereunder. This Court has supplemental jurisdiction over plaintiff's state law claims pursuant to 28 U.S.C. §1367(a).

11. Jurisdiction is also conferred by 28 U.S.C. §1332. Complete diversity among the parties exists and the amount in controversy exceeds $75,000, exclusive of interest and costs.

12. This derivative action is not a collusive action to confer jurisdiction on a court of the United States that would not otherwise have such jurisdiction.

13. This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the district courts permissible under traditional notions of fair play and substantial justice.

14. Venue is proper in this Court in accordance with 28 U.S.C. §1391 because: (i) Vail maintains its principal place of business in this District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to Vail, occurred in this District; and (iv) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## THE PARTIES

**Plaintiff**

15. Plaintiff Gary Peterson was a stockholder of Vail at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is a current Vail stockholder. Plaintiff is a citizen of Minnesota.

**Nominal Defendant**

16. Nominal defendant Vail is a Delaware corporation with principal executive offices located at 390 Interlocken Crescent, Broomfield, Colorado. Accordingly, Vail is a citizen of Delaware and Colorado. Vail, through its subsidiaries, is the leading global mountain resort operator. The Company's operations are grouped into three integrated and interdependent segments: Mountain, Lodging, and Real Estate. The Mountain segment consists of forty-two Destination Ski Resorts and Regional Ski Areas. The Lodging segment includes ownership/management of a group of luxury hotels, condominiums, a resort ground-transportation company, and mountain resort golf courses. Finally, the Real Estate segment includes the sale of land parcels to third-party developers and planning for future real estate development projects, including zoning and acquisition of applicable permits. As of July 31, 2025, Vail employed approximately 6,800 year-round employees and over the course of the Company's various winter and summer operating seasons in fiscal 2025, it employed approximately 39,800 seasonal employees. In addition, the Company employed approximately 280 year-round employees and 150 seasonal employees on behalf of the owners of Vail's managed hotel properties.

**Defendants**

17. Defendant Katz has been Vail's CEO since February 2006, Chairperson since May 2025, and a director since June 1996. He was also Vail's Executive Chairperson from November 2021 to May 2025; Chairperson from March 2009 to November 2021; and held various positions of increasing responsibility from 1992 to June 2003. Vail paid defendant Katz the following compensation as an executive:

| Year | Salary | Stock Awards | Option/Share Appreciation Right Awards | All Other Compensation | Total |
|---|---|---|---|---|---|
| 2025 | $1,123,588 | $1,405,693 | $1,405,693 | $17,256 | $3,952,230 |
| 2024 | $1,086,908 | $545,766 | $545,895 | $23,501 | $2,202,070 |
| 2023 | $1,050,769 | $529,894 | $529,965 | $23,051 | $2,133,679 |
| 2022 | $1,000,320 | $499,847 | $499,986 | $22,301 | $2,022,454 |
| 2021 | $809,372 | $1,034,933 | $1,936,862 | $33,622 | $3,814,789 |
| 2020 | $688,534 | $1,034,942 | $1,034,976 | $31,445 | $2,789,897 |

Defendant Katz is a citizen of Colorado.

18. Defendant D. Bruce Sewell ("Sewell") has been a Vail director since January 2013. He has been a member of Vail's Audit Committee since at least October 2020. Vail paid defendant Sewell the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2025 | $162,500 | $220,316 | $11,502 | $394,318 |
| 2024 | $165,760 | $220,139 | $12,857 | $398,756 |
| 2023 | $155,000 | $220,283 | - | $375,283 |
| 2022 | $155,000 | $207,595 | - | $362,595 |
| 2021 | $129,166 | $207,690 | - | $336,856 |
| 2020 | $103,334 | $207,635 | - | $310,969 |

Defendant Sewell is a citizen of California.

19. Defendant Hilary A. Schneider ("Schneider") has been a Vail director since March 2010. Vail paid defendant Schneider the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2025 | $97,500 | $220,316 | $23,130 | $340,946 |
| 2024 | $95,564 | $220,139 | - | $315,703 |
| 2023 | $85,000 | $220,283 | - | $305,283 |
| 2022 | $85,000 | $207,595 | $16,771 | $309,366 |
| 2021 | $70,833 | $207,690 | $21,321 | $299,844 |
| 2020 | $56,667 | $207,635 | - | $264,302 |

Defendant Schneider is a citizen of California.

20. Defendant Peter A. Vaughn ("Vaughn") has been a Vail director since June 2013. Defendant Vaughn has been a member of Vail's Audit Committee since at least October 2020. Vail paid defendant Vaughn the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2025 | $122,500 | $220,316 | $17,201 | $360,017 |
| 2024 | $114,593 | $220,139 | $13,637 | $348,369 |
| 2023 | $100,000 | $220,283 | $14,074 | $334,357 |
| 2022 | $95,652 | $207,595 | $16,218 | $319,465 |
| 2021 | $75,000 | $207,690 | $14,223 | $296,913 |
| 2020 | $59,018 | $207,635 | $4,000 | $270,653 |

Defendant Vaughn is a citizen of New Jersey.

21. Defendant Susan L. Decker ("Decker") has been a Vail director since September 2015. Vail paid defendant Decker the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2025 | $97,500 | $220,316 | $10,247 | $328,063 |
| 2024 | $95,564 | $220,139 | - | $315,703 |
| 2023 | $85,000 | $220,283 | - | $305,283 |
| 2022 | $93,696 | $207,595 | $11,736 | $313,027 |
| 2021 | $87,500 | $207,690 | - | $295,190 |
| 2020 | $70,000 | $207,635 | - | $277,635 |

Defendant Decker is a citizen of Utah.

22. Defendant Michele Romanow ("Romanow") has been a Vail director since October 2016. Vail paid defendant Romanow the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2025 | $97,500 | $220,316 | - | $317,816 |
| 2024 | $95,564 | $220,139 | $13,455 | $329,158 |
| 2023 | $85,000 | $220,283 | - | $305,283 |
| 2022 | $85,000 | $207,595 | $16,181 | $308,776 |
| 2021 | $70,833 | $207,690 | - | $278,523 |
| 2020 | $61,246 | $207,635 | - | $268,881 |

Defendant Romanow is a citizen of Canada.

23. Defendant Nadia Rawlinson ("Rawlinson") has been a Vail director since December 2019. Vail paid defendant Rawlinson the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2025 | $110,000 | $220,316 | $18,567 | $348,883 |
| 2024 | $107,677 | $220,139 | - | $327,816 |
| 2023 | $95,000 | $220,283 | $12,980 | $328,263 |
| 2022 | $90,652 | $207,595 | - | $298,247 |
| 2021 | $70,833 | $207,690 | - | $278,523 |
| 2020 | $24,995 | $167,895 | - | $192,890 |

Defendant Rawlinson is a citizen of Illinois.

24. Defendant Iris Knobloch ("Knobloch") has been a Vail director since February 2024. Vail paid defendant Knobloch the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2025 | $97,500 | $220,316 | $317,816 |
| 2024 | $47,225 | $144,828 | $192,053 |

Defendant Knobloch is a citizen of France.

25. Defendant Reginald Chambers ("Chambers") has been a Vail director since March 2024. He has been a member of Vail's Audit Committee since at least October 2024 and Chair since at least October 2025. Vail paid defendant Chambers the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2025 | $105,416 | $220,316 | $325,732 |
| 2024 | $40,173 | $121,847 | $162,020 |

Defendant Chambers is a citizen of New York.

26. The defendants identified in ¶¶17-25 are referred to herein as the "Director Defendants." The defendants identified in ¶¶18, 20, 25 are referred to herein as the "Audit Committee Defendants." Collectively, the defendants identified in ¶¶17-25 are referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

### Fiduciary Duties

27. By reason of their positions as officers and directors of the Company, each of the Individual Defendants owed and owe Vail and its stockholders fiduciary obligations of care and loyalty, and were and are required to use their utmost ability to control and manage Vail in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Vail and not in furtherance of their personal interest or benefit.

28. To discharge their duties, the officers and directors of Vail were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company. By virtue of such duties, the officers and directors of Vail were required to, among other things:

(a) comply with antitrust laws and ensure the Company was complying with antitrust laws;

(b) conduct the affairs of the Company in an efficient, business-like manner in compliance with all applicable laws, rules, and regulations so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock; and

(c) remain informed as to how Vail conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws.

29. The Individual Defendants, because of their advisory, executive, managerial, and directorial positions of control and authority, were able to and did, directly or indirectly, exercise control over the commission of the wrongdoing complained of herein. Each Individual Defendant acted with actual or constructive knowledge of the primary wrongdoing, either took part in, or substantially assisted the accomplishment of, that wrongdoing, and was or should have been aware of his or her overall contribution to and in furtherance of the wrongdoing.

30. Additionally, the Individual Defendants are required to adhere to the Company's Code. Vail's Code states that the Company must keep "accurate, complete and timely" records. The Code further states that "[t]he Company is committed to ethical behavior and full compliance with all laws, regulations, and Company policies that apply to our business." The Code included a dedicated "Antitrust and Fair Competition" section. Under that policy, the Company acknowledged that the antitrust laws forbid "[f]ixing the prices or terms of sale for competing products (e.g., signaling future lift ticket or season pass pricing)." The policy instructed that "[c]ertain kinds of information, such as pricing, marketing plans, and bids ... cannot be exchanged or discussed with competitors, no matter how innocent or casual the exchange may be and regardless of the setting, whether business or social," and warned that "[t]here are no off-the-record discussions with competitors." The Company's own policy thus identified, and expressly prohibited, the categories of pricing signaling and competitor information exchange that violate

the antitrust laws. The existence of that policy establishes that the antitrust hazard was recognized and anticipated within the Company.

**Breaches of Duties**

31. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of Vail, the absence of good faith on their part, and a reckless disregard for their duties to the Company that the Individual Defendants were aware or reckless in not being aware posed a risk of serious injury to the Company.

32. The Individual Defendants breached their duty of loyalty by allowing defendants to cause, or by themselves causing, the Company to engage in anticompetitive conduct, improper and illegal practices that wasted the Company's assets, and caused Vail to incur substantial damage.

33. The Individual Defendants, because of their positions of control and authority as officers or directors of Vail, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein. The Individual Defendants also failed to prevent the other Individual Defendants from taking such illegal actions. As a result, and in addition to the damage the Company has already incurred, Vail has expended, and will continue to expend, significant sums of money.

**Additional Duties of the Audit Committee Defendants**

34. In addition to these duties, under the Audit Committee Charter in effect since December 7, 2022, the Audit Committee Defendants, defendants Sewell, Vaughn, and Chambers, owed specific duties to Vail, to assist the Board in overseeing antitrust compliance. Moreover, the

Audit Committee's Charter requires the Audit Committee to also oversee the Company's proxy statements, system of internal controls, and risk management process. In particular, the Audit Committee's Charter listed additional responsibilities of the Audit Committee, stating:

> **Purpose**
>
> The Audit Committee … is appointed by the Board to assist the Board in fulfilling its oversight responsibilities. The Committee's purpose is to oversee:
>
> * * *
>
> 4. ***The performance of the Company's internal audit and compliance functions;***
>
> 5. ***The Company's legal and regulatory requirements;***
>
> 6. ***The effectiveness of the Company's enterprise risk management program; and***
>
> 7. ***The annual preparation of a report as required by the Securities and Exchange Commission ("SEC") to be included in the Company's annual proxy statement***.
>
> ***In general, the function of the Committee is oversight***; it is management's responsibility to maintain appropriate systems for accounting and internal controls, and the Independent Auditor's responsibility to plan and carry out a proper audit.
>
> * * *
>
> **Committee Authority and Responsibilities**
>
> The Committee shall:
>
> * * *
>
> 2. Have the authority to conduct any investigation appropriate to fulfilling its responsibilities. In discharging its oversight role, the Committee is empowered to investigate any matter brought to its attention with full access to all books, records, facilities and personnel of the Company as well as direct access to the Independent Auditor and the power to retain external counsel or other experts or advisors for this purpose. The Committee shall approve the fees and other retention terms related to any such external counsel, experts and advisors retained by the Committee.
>
> 3. Establish procedures for the receipt, retention, and treatment of complaints from the Company's employees with respect to accounting, internal accounting controls

or auditing matters, as well as for confidential, anonymous submissions by Company employees of concerns regarding questionable accounting or auditing matters.

* * *

5. Receive appropriate funding from the Company to compensate outside legal or other advisors employed by the Committee, as well as funding to cover the Committee's administrative expenses necessary or appropriate in carrying out its duties. The Committee shall not be required to seek Board approval for such funding.

6. ***At least annually, obtain and review a report by the Independent Auditor describing: (i) the Independent Auditor's internal quality control procedures and (ii) any material issues raised by the most recent internal quality control review (or peer review) of the Independent Auditor, or by any inquiry or investigation by governmental or professional authorities, within the preceding five years, respecting one or more independent audits carried out by the Independent Auditor, and any steps taken to deal with any such issues***.

7. Discuss with management and the Independent Auditor and meet to review the Company's annual audited financial statements and quarterly financial statements proposed to be included in the Company's periodic reports to be filed with the SEC, including reviewing the Company's specific disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations", and recommend whether or not such financial statements should be so included.

8. At least annually, review the internal audit plan and evaluate the performance, responsibilities, and staffing of the Company's internal audit function. ***Receive and review periodic presentations from the internal audit senior executive regarding the results of completed internal audits and the identification and remediation of weaknesses in the Company's internal control environment***.

* * *

10. ***Require management to establish and maintain an enterprise risk management process and will regularly discuss the Company's major risk exposures, the steps management has taken to monitor and control such exposures, and guidelines and policies to govern the Company's risk assessment and risk management processes. In addition, the Committee will periodically report to the Board regarding significant matters identified with respect to the foregoing***.

* * *

> 16. ***Review the results of management's efforts to monitor compliance with the Company's programs and policies designed to ensure adherence to applicable laws and regulations, as well as to its Code of Ethics and Business Conduct***, including review and approval of related-party transactions as provided in the Company's Related Party Transactions Policy. ***At least annually, meet to review the implementation and effectiveness of the Company's compliance program with the General Counsel, who shall have the authority to communicate directly to the Committee, promptly, about actual and alleged violations of the Code of Ethics and Business Conduct,*** including any matters involving criminal or potential criminal conduct.
>
> * * *
>
> 21. ***Review with the Company's General Counsel legal matters, as appropriate and at least annually in connection with the audit, which may have a material impact on the financial statements and any material legal or regulatory compliance matters***.
>
> * * *
>
> 26. Make regular reports to the Board.
>
> 27. Conduct an annual performance evaluation of the Committee as compared to the requirements of this Charter.
>
> 28. Review and reassess the adequacy of this Charter annually and recommend any proposed changes to the Board for approval.

35. While the Audit Committee Defendants had clear responsibilities with respect to ensuring that there were controls regarding the Company's compliance with antitrust laws, the Audit Committee Defendants failed to fulfill these responsibilities. In fact, the Audit Committee Defendants have gravely harmed the Company by taking part in the publishing of the false and misleading 2024 Proxy described in more detail below.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

36. In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design. In addition to the

wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and assisted each other in breaching their respective duties.

37. During all times relevant hereto, the Individual Defendants, collectively and individually, initiated a course of conduct that was designed to and did: (i) deceive the investing public, including stockholders of Vail, regarding the Individual Defendants' management of Vail's operations, including the Company's compliance with antitrust laws; and (ii) enhance the Individual Defendants' executive and directorial positions at Vail and the profits, power, and prestige that the Individual Defendants enjoyed as a result of holding these positions. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants, collectively and individually, took the actions set forth herein.

38. The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and common course of conduct was, among other things, to disguise the Individual Defendants' violations of law, breaches of fiduciary duty, and unjust enrichment; and to conceal adverse information concerning the Company's participation in a coordinated anticompetitive scheme.

39. The Individual Defendants accomplished their conspiracy, common enterprise, and common course of conduct by causing the Company to purposefully or recklessly collude with competitors to fix prices of lift tickets. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and common course of conduct complained of herein.

40. Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted in the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## VAIL WAS REQUIRED TO COMPLY WITH ANTITRUST LAWS AND POLICIES

41. The Company's revenues turn overwhelmingly on how it prices lift access and related goods sold in interstate commerce. As a result, the Individual Defendants bore an affirmative obligation to keep Vail on the right side of the antitrust laws, the very laws that forbid the conduct now at issue.

**Section 1 of the Sherman Act—Horizontal Conspiracy and Information Exchange**

42. Section 1 of the Sherman Act reaches every combination or conspiracy that unreasonably restrains trade. An agreement among direct competitors to set, lift, hold, or steady prices is condemned as *per se* unlawful. An agreement among rivals to trade competitively sensitive, non-public data for the purpose of propping up or stabilizing prices is likewise unlawful under section 1. The U.S. Department of Justice (the "DOJ") has recognized that "when competitors agree to exchange competitively sensitive information only among each other, it suggests that the information sharing will benefit only the competitors at the expense of consumers, workers, or other market participants."[6] A conspiracy to fix, raise, maintain, or stabilize prices through such an information exchange constitutes a *per se* violation of section 1.

---

[6] *See In re Pork Antitrust Litig.*, No. 18-cv-01776, Statement of Interest of the United States, at 16 (D. Minn. Oct. 1, 2024) available at https://www.justice.gov/atr/media/1371806/dl.

**Section 1 of the Sherman Act—Unlawful Tying and Bundling**

43. Section 1 of the Sherman Act separately condemns tying and exclusionary bundling, whereby a seller with power over one product forces buyers to take a second, distinct product as the price of access to the first. That prohibition captures discount bundling, in which the seller does not literally require a combined purchase but coerces one by pricing the standalone products at a punitive premium relative to the bundle. A tying claim requires both a tying product market and a separate tied product market, together with market power in the tying market sufficient to restrain trade in the tied market. Conduct of this kind may be condemned as unlawful *per se* or, in the alternative, under a quick-look or full rule-of-reason review.

**The Clayton Antitrust Act**

44. Sections 4 and 16 of the Clayton Antitrust Act, 15 U.S.C. §§15 and 26 (the "Clayton Act"), entitle private plaintiffs injured by antitrust violations to recover treble damages, together with injunctive relief and attorneys' fees. Injunctive relief available under the Clayton Act extends to structural remedies, including divestiture sufficient to restore competition in the relevant market. These remedies impose potentially enormous exposure to a company found to have violated antitrust laws.

**State Antitrust Laws, the Hart-Scott-Rodino Act, and Antitrust Merger Review**

45. State antitrust statutes bound the Company in addition to federal law. Section 6-4-104 of the Colorado Act prohibits the same anticompetitive bundling and restraint of trade and authorizes its own treble damages, injunctive relief, and fees.

46. The Hart-Scott-Rodino Antitrust Improvements Act of 1976 (the "Hart-Scott-Rodino Act") compels pre-merger notice and antitrust review of acquisitions above defined size

thresholds, sending qualifying transactions to the DOJ or the Federal Trade Commission for review. Acquisitions structured to fall below those thresholds escape automatic federal scrutiny. That an operator's ski-resort acquisitions can raise antitrust concern is well established. When Vail acquired Ralston Resorts, Inc. in 1997, the DOJ reviewed the transaction and required the divestiture of the Arapahoe Basin resort, cautioning in its competitive impact statement that, absent divestiture, front-range Colorado discounted lift-ticket prices would climb "on the order of 4%." The Individual Defendants' duty of oversight extended to ensuring that the Company's acquisition strategy did not unlawfully foreclose competition in the Destination Ski Resort market.

**LIFT-ACCESS PRICING IS MISSION-CRITICAL TO VAIL**

47. This is not a case in which one product line sits at the periphery of a sprawling, diversified company. For Vail, how it prices lift access, meaning day tickets and, above all, the multi-mountain Epic Pass, is the core of the enterprise. The Company built the Epic Pass and pioneered the category, offering a first-of-its-kind season pass that moved buyers off single-day tickets and into discounted, paid-in-advance, season-long commitments. Through the Epic Pass and its pricing, the Company draws the lion's share of its revenue and its visits.

48. The Company's own filings confirm that the Epic Pass drives the business. "For Fiscal 2025, our pass products generated approximately 65% of our total lift revenue and approximately 75% of total visitation (excluding complimentary access). Sales of pass products are a key component of our overall Mountain segment revenue and help create strong synergies among our Resorts."[7] The share of lift revenue attributable to passes climbed from 47% in 2018

---

[7] Vail Resorts, Inc., Annual Report (Form 10-K), at 10 (Sept. 29, 2025) (the "2025 Form 10-K").

to 65% by 2024. A decade earlier, for the 2014-2015 period, season-pass products had supplied just 40% of lift revenue, underscoring how completely the Company has reoriented itself around the pass. Nothing else the Company sells matters more to its results, and no decision it makes carries greater consequence for its stockholders than how it prices that pass.

49. The Company's dependence on pass pricing is matched by the scale of its pass base. Epic Pass membership grew from 60,000 at the 2008 launch to more than two million. By the 2024-2025 season the Company was selling roughly 2.3 million Epic Passes. The Company puts next season's passes on sale months ahead of opening day and shuts off sales in early December, before the season peaks, committing customers to the coming winter long before the lifts turn. As a result, an entire season's revenue is largely locked in by pricing choices made and broadcast months in advance.

50. Because pricing is the engine of the business, it is also where the Company's legal peril concentrates. A risk this fundamental to revenue, and this close to conduct now challenged in the Antitrust Actions, was a mission-critical exposure the Individual Defendants had a non-delegable duty to monitor and to control. Lift-access pricing was not an ancillary detail of Vail's operations. It was the operation itself.

51. The centrality of pricing also forecloses any claim that the Board stood at arm's length from the conduct in question. Defendant Katz did not merely tolerate the aggressive pricing strategy; he claimed it publicly and repeatedly. Defendant Katz told the *New York Times* that "Vail's lift-ticket prices have been 'intentionally' aggressive" and that "[t]hey pushed customers to buy Epic Passes." In a February 2026 interview with the *Wall Street Journal*, defendant Katz went further, allowing that Vail's approach had lifted lift-ticket prices across the industry, in what he

called "an industry wide ... transformation that happened that our company absolutely led." Observers have described the Company's "central strategy" as an effort to "drive more and more skiers towards the 'subscription model' of locking into an Epic season pass more than half a year ahead of the next season."[8] This was no obscure, back-office matter. It was a strategy the Company's most senior fiduciary trumpeted from the podium.

**THE STRUCTURE OF THE DESTINATION SKI RESORT MARKET**

52. North American ski areas fall broadly into two categories, the larger Destination Ski Resorts and the smaller Regional Ski Areas. A Destination Ski Resort generally sits atop what the NSAA classifies as an "Extra-Large" ski mountain. Such resorts bundle a full slate of goods and services around a "village" that can support multiday stays, including rentals, lessons, and on-mountain food, drink, and lodging. Regional Ski Areas are the opposite in kind, occupying smaller ski hills with thinner infrastructure, fewer guests, and a clientele drawn mostly from the surrounding area.

53. According to the Antitrust Actions, out of roughly 505 operating U.S. ski areas, only thirty-two rise to Destination Ski Resort status, yet that handful commands the majority of the nation's ski traffic. The domestic market is notably self-contained, as about 97% of skiers at U.S. mountains are U.S. citizens and few Americans travel abroad to ski. What these resorts actually sell is the "Destination Ski Package," the full basket of trip-related purchases, from the lift ticket to rentals, lessons, and other add-ons.

---

[8] Zach Armstrong, *Vail Resorts CEO Rob Katz Shifts Focus To Day Lift Tickets For 2025-26 Season*, Snow Brains (Oct. 16, 2025), available at https://snowbrains.com/vail-resorts-ceo-rob-katz-shifts-focus-to-day-lift-tickets-for-2025-26-season/.

## VAIL AMASSED MARKET POWER THROUGH SERIAL ACQUISITIONS

54. Across some three decades, Vail grew from a one-mountain operator into the world's largest resort company by stringing together acquisition after acquisition. The original Vail opened in 1962, and in 1992, the private equity vehicle Apollo Ski Partners bought Vail Associates and incorporated Vail. Five years later Vail took over Ralston Resorts, Inc., capturing the Colorado Destination Ski Resorts of Keystone and Breckenridge, at a time when Vail and Ralston Resorts, Inc. were Colorado's two largest resort owner/operators. Vail went public in the wake of that deal.

55. From 2010 to 2017, the Company expanded so aggressively that one ski outlet quipped Vail had "secured the rights to all North American snowfall for the 2018/19 season." In that window Vail acquired Northstar (California), Afton Alps (Minnesota), Kirkwood Mountain (California), Mount Brighton (Michigan), Canyons (Utah), Park City (Utah), Wilmot Mountain (Wisconsin), Whistler Blackcomb (Canada), and Stowe Mountain (Vermont), including Destination Ski Resorts such as Canyons, Park City, and Whistler Blackcomb. The bulk of those deals never triggered a Hart-Scott-Rodino Act review. In 2018, Vail added three more areas, including Vermont's Okemo Destination Ski Resort. A year later it acquired Peak Resorts, folding in seventeen U.S. areas and bringing major metropolitan markets, from Hunter Mountain (New York) to Mount Snow (Vermont) and a string of Mid-Atlantic and Midwest Regional Ski Areas. Then CEO defendant Katz framed the rationale in market-reach terms, saying the deal let Vail "make a much stronger connection to guests in critical cities in the Mid-Atlantic and Midwest." Vail had unveiled this "feeder hill strategy" in 2012, describing it as a plan "to drive season pass sales and build broader guest loyalty by looking at premier Regional Ski Areas located near major

urban markets."

56. Vail closed on three Pennsylvania properties, Seven Springs Mountain included, in 2021. On a December 2024 earnings call, former CEO Kirsten Lynch signaled the appetite was ongoing, saying Vail continually looks for "more families or owners of assets who want to make a transition" and that there remain "specific areas in North America we would like to acquire." As of 2026, Vail runs forty-two ski areas, and at least ten of the country's thirty-two Destination Ski Resorts among them.

57. As explained in the Antitrust Actions, Vail and its co-defendants came to own or control access to all but two of the thirty-two U.S. Destination Ski Resorts. Between them, Vail and Alterra own every one of the top-ten domestic Destination Ski Resorts and twenty of the thirty-two in total. Assuming equal visits and revenue across those resorts, the Resort Conspirators (Vail, Alterra, Boyne, and Powdr) command at least 81% of the market, a floor that understates their position because both metrics tilt toward the largest resorts. Vail itself reports owning the first, second, fourth, ninth, and tenth most-visited ski resorts in the country. In the states that anchor the Destination Ski Resort market, Epic and Ikon Passes between them cover most of the lift capacity, at 86% in Colorado, 74% in Utah, and 66% in California. Entry barriers are steep by the Company's own account, as its 2025 Form 10-K concedes that "there have been virtually no new destination ski resorts of scale in North America for nearly 45 years."

## THE INDIVIDUAL DEFENDANTS PERMITTED VAIL TO ENGAGE IN, AND FAILED TO HALT, THE ANTICOMPETITIVE CONDUCT

### Twin Threats Created Strong Incentives to Collude

58. By the time the industry had consolidated into a few dominant hands, Vail and its rivals had grown anxious about two shared threats to their collective bottom line, a changing

climate and an emerging pandemic. Vail's Annual Report on Form 10-K for the fiscal year ended July 31, 2020, filed with the SEC on September 24, 2020, flagged climate change as a serious "risk factor" capable of producing "a material adverse effect on our results of operations." In June 2021, the Resort Conspirators rolled out a "Climate Collaborative Charter," pledging, among other things, to "[p]lace collaboration over competition when it comes to sustainability." Boyne's CEO traced the genesis of the four rivals' decision to "unite" to a conversation "formed at an industry conference in October of 2019." This open coordination among competitors served as both a template and a springboard for the wider scheme.

59. The pandemic compounded the strain and produced strikingly parallel reactions. On September 14, 2020, Alterra's CEO laid out plans to manage visitation by "prioritizing access for season pass holders" and to "tightly regulate the number of daily lift tickets." Barely a week and a half later, defendant Katz unveiled a reservation regime favoring passholders and capping day-ticket sales. The NSAA had created a "Growth Committee" in late 2018, staffed with RRC, whose then President framed the mission collaboratively, stating, "We all have to work together on this. It's not about one resort stealing visits from another." These pressures pushed Vail, encouraged by the NSAA and RRC, to start working together with its rivals to defend their shared position and profits.

**Beginning No Later than January 2020, Vail Participated in an Unlawful Information Exchange and Price-Fixing Conspiracy**

60. According to the Antitrust Actions, from January 2020 onward, Vail and its horizontal competitors Alterra, Boyne, and Powdr, working through the NSAA and RRC, knowingly traded confidential, competitively sensitive data to raise, fix, hold, and steady the prices of Destination Ski Packages. Each Resort Conspirator funneled the same categories of current,

non-public figures, covering revenue, cost, capacity, and supply data across passes, day tickets, rentals, and lessons, to RRC at the NSAA's direction. RRC turned that raw data into detailed benchmarking reports, delivered to NSAA members like Vail ahead of each season, which Vail then drew on in shaping the pricing and strategy it would run for the year to come.

61. As explained in the Antitrust Actions, RRC sits at the center of the industry's data flows, serving as the NSAA's self-described core research partner. According to the Antitrust Actions, two of its annual products matter most here, the NSAA Kottke End of Season & Guest Experience Study (the "Kottke Report") and the NSAA Economic Analysis of United States Ski Areas (the "Economic Analysis"). The Kottke Report pulls together operational and demographic inputs from participating resorts, the Resort Conspirators among them, and carries a "Ticket Price, Yield, and Yield Ratio" section laying out average prices and yields nationally, by region, and by resort size. As revealed in the Antitrust Actions, one recent edition reported that the national average adult weekend ticket price hit a record $192 for the 2023/2024 season, roughly double the figure a decade earlier. The Economic Analysis, in turn, assembles granular, resort-by-resort data on revenue, expense, profit, capacity, and demand, covering essentially every meaningful business metric in the industry, and publishes it nationally, regionally, and by size across a rolling ten-year history.

62. According to the Antitrust Actions, the reports' data confidentiality terms let RRC and the NSAA hand one Resort Conspirator a competitor's resort-level figures without limitation, provided that the specific resort went unnamed. Because each edition of both reports listed every participating resort, Resort Conspirators included, resorts could tell at a glance which rivals remained in the exchange, giving them a ready means to watch and enforce ongoing participation.

RRC, acting for the NSAA, banks all of these sensitive, resort-specific numbers, together with the aggregated data, in a sprawling database it enlarges year over year.

63. According to the Antitrust Actions, private consulting deals gave individual Resort Conspirators, Vail included, a back channel to their rivals' data. RRC leveraged the nonpublic, resort-specific information in its exclusive keeping to steer these clients' pricing and other decisions, decisions the clients then followed, letting Vail set Destination Ski Package prices at inflated levels while sparing itself genuine competition. RRC began pitching these consulting arrangements in 2020, dangling access to its deep databases of skier information. As revealed in the Antitrust Actions, RRC marketed the service as a way to "navigate" matters like "pricing" and "competition." By way of example, RRC supplied Vail with total U.S. skier-visit figures. RRC published a client roster naming Vail in December 2019 and kept that list, Vail still on it, public throughout the wrongdoing. All the while, RRC served as a *de facto* fiduciary to the competing Resort Conspirators even as it warehoused and wielded the rivals' confidential data on their behalf.

64. Vail's senior ranks held the reins of the very trade association running the exchange. Vail's Patricia A. Campbell ("Campbell") stepped into the NSAA Vice Chair role for the 2020-2021 term, moved up to a two-year term as Chair beginning in 2022, and then served as Immediate Past Chair. As revealed in the Antitrust Actions, the Economics Committee of the NSAA board, working closely with RRC, superintends the preparation and distribution of the industry reports.

65. According to the Antitrust Actions, Vail's leaders talked shop with their competitors, on pricing and other sensitive subjects, at NSAA gatherings both just before and during the wrongdoing. At the 2019 National Convention and Tradeshow, a "State of the Industry" panel put Vail's Campbell beside Alterra's Rusty Gregory, where the two discussed multi-area

passes, the cost of same-day ticket purchases, staffing, and a range of other topics. At the 2022 National Convention and Tradeshow, former Vail CEO Kirsten Lynch shared the closing general session with predecessor defendant Katz, who "addressed the elephant in the room: The well-documented issues of crowding at Vail properties and the discounted Epic Pass," while "[c]apacity management was another hot topic." At the 2023 National Convention and Tradeshow, Vail's Western Region Senior Vice President and Chief Operating Officer Doug Pierini ("Pierini") joined a panel with the CEOs of Boyne and Alterra, moderated by technology firm Aspenware's CEO, and, once "[t]he conversation turned to pricing and growth," walked through "each company's strategy [for] season passes," with Pierini noting that Vail "does limit day ticket sales on certain days at certain properties" to manage capacity. At the 2026 National Convention and Tradeshow, a panel pairing CEO defendant Katz with Boyne's CEO and Alterra's President "touched on," among other things, "consolidation" and "season pass strategy." A trade publication watching these exchanges captured the dynamic as "the U.S. ski industry's collaborative culture, where competitors are also resources for one another."

**Coordinated Dynamic Pricing Through the Aspenware Platform**

66. Three of the Resort Conspirators, Alterra, Boyne, and Powdr (the "Ikon Pass Resort Conspirators"), ran their commerce on a single platform and dynamic-pricing engine supplied by Aspenware, a technology firm Alterra co-owns, and used it to standardize their data and align on a common pricing approach for Destination Ski Packages. Getting onto the Aspenware Commerce platform required each of them to adopt an identical set of data fields, which made the broader information exchange run more smoothly and more effectively. Aspenware's CEO conceded the breadth of the data at the firm's fingertips, stating, "[w]e have access to all the Jackson Hole data,

all the Telluride data, all that stuff we work with," and "we maintain all of that stuff internally."

67. Aspenware teamed with a technology consultancy to build a large-language-model pipeline that would recast each client's mismatched data "into standardized, human-readable product intelligence across all partner resorts," setting "the groundwork for new pricing optimizations" and feeding "real-time pricing logic." The consultancy forecast that the tool would generate roughly a "+3% uplift in ticket product revenue" across the system, with more upside among repeat buyers. Aspenware pitched its Dynamic Pricing module as "a proven strategy to maximize revenue," letting resorts "increase yield" by tuning prices for weekday versus weekend, peak versus off-peak, and by how early a buyer purchases. According to the Antitrust Actions, the Ikon Pass Resort Conspirators ran exactly these dynamic-pricing tactics for day tickets through the platform. Vail did not itself use Aspenware, but it knew its co-defendants did, took part in the same NSAA/RRC exchange, reaped the benefit of the resulting data standardization, and rolled out its own dynamic-pricing approach on an in-house system.

**Vail Also Used Supracompetitive Lift-Ticket "Penalty" Pricing to Coerce Consumers into the Epic Pass**

68. Reinforcing the pricing conduct at the core of the conspiracy, Vail intentionally pitched single-day lift-ticket prices at its Destination Ski Resorts at punishing levels to herd buyers toward the Epic Pass. Those inflated day-ticket prices function as a penalty price that makes buying access outside the Epic ecosystem look economically foolish, steering consumers into the costlier pass. For 2025-2026, a single day at Vail Mountain ran as high as $356, and a day at Alterra's Steamboat reached $339. At Park City, a one-day ticket carried a $385 price with tax over the 2025 holidays. Nationwide, the average window rate at large resorts has more than doubled since the mid-2000s. The Company's CEO confirmed the design, conceding that day-

ticket prices were set "intentionally" high to drive Epic Pass sales.

69. The Company also engineered its sales calendar to sharpen the squeeze, opening next-season-pass sales roughly six months ahead and closing them before the peak, so that anyone who fails to commit early risks losing the chance to buy the pass at all that season. Through the Epic Pass, Vail leveraged its grip on must-have Destination Ski Resort access to make reasonably priced entry to those marquee mountains contingent on buying an all-or-nothing bundle that also sweeps in Regional Ski Areas a customer may have no use for. That bundling shuts out independent Regional Ski Areas, which cannot assemble a package anchored by must-have destination resorts, and diverts skier demand away from independents and into the Company's own network.

**The Conspiracy Achieved Its Intended Effect: Parallel, Supracompetitive Prices**

70. The scheme worked as designed. Prices for Destination Ski Packages marched upward together, in lockstep, and untethered from ordinary market forces. Starting prices for the competing multi-mountain passes climbed in parallel, with Alterra's Ikon and Ikon Base passes up more than 45%. Epic Pass rose 39% since 2021-2022, from $783 to $1,089. Setting aside the anomalous pandemic year, the Ikon and Epic pass increases were remarkably similar.

71. Peak day-ticket prices tracked the same parallel path. Vail Mountain's day ticket climbed from $219 in 2019 to $356 in 2025, Beaver Creek's from $189 to $356, and Breckenridge's from $173 to $321. These day-ticket prices tend to surface in late summer or early fall, just as RRC finishes compiling pricing and satisfaction data from the resorts and counsels its clients on the coming season's base and peak rates.

72. The inflation reached the whole Destination Ski Package, not lift access alone. As revealed in the Antitrust Actions, average lift-ticket-and-pass revenue at the Destination Ski Resorts jumped from roughly $52.4 million in 2020-2021 to about $75 million in 2023-2024. Rental and lesson revenue rose sharply as well, propelled by higher prices. The all-in price of a typical Destination Ski Package at Vail, Beaver Creek, Breckenridge, and Steamboat rose about 50% between 2019-2020 and 2024-2025, even as the resorts' profits roughly doubled on average over the period. By the *Denver Gazette's* estimate, a week-long family trip to Breckenridge went from $10,000 in 2020-2021 to $14,000 in 2025-2026, while average revenue per skier visit climbed from $126.54 to $162 between 2020-2021 and 2023-2024.

**The Market Possesses "Plus Factors" Establishing Susceptibility to Collusion**

73. According to the Antitrust Actions, the Destination Ski Resort market carries the classic plus factors that make a market ripe for collusion and a cartel easier to form and sustain, including steep entry barriers, heavy concentration, inelastic demand, conduct against self-interest, and abundant chances to coordinate. Entry barriers run high, and Vail's own 2025 Form 10-K admits that "there have been virtually no new destination ski resorts of scale in North America for nearly 45 years." Concentration is pronounced, with Vail and Alterra holding all ten of the top Destination Ski Resorts and the Resort Conspirators holding most of the Destination Ski Resorts. Demand is inelastic because substitutes are scarce, and a modest but real price increase would not send skiers to other pastimes or to resorts overseas.

74. Vail acted against its own economic interest by feeding rivals the very data they could use to price against it, behavior that makes no sense unless Vail understood the exchange would be mutual. No single resort would surrender that data absent confidence that it would reap

the same benefit from everyone else's reciprocal disclosures. By publishing the roster of participants and clients, the NSAA and RRC blunted the temptation to defect and made staying in the arrangement the safer course. According to the Antitrust Actions, trade-association gatherings such as the NSAA's handed the Resort Conspirators' executives repeated, ready-made venues to discuss pricing, revenue, costs, and the like.

**The Conduct Degraded Quality of Vail's Own Resorts and Was Self-Concealing**

75. With the Resort Conspirators no longer competing on the value of the Destination Ski Package, the quality of the guest experience slid. Jammed mountains, thinned-out rental fleets, and lean on-mountain staffing draw steady complaints, with guests routinely reporting lift lines of thirty to sixty minutes made worse by breakdowns. Vail's resorts became so crowded that a February 2020 image of Vail Mountain earned the nickname the "lift line apocalypse." At Vail's own Park City Mountain Resort, guests have reported late openings, choked trails, and lift stoppages, conditions that boiled over in December 2024, when the resort's ski patrol went on strike over what the union called unfair wages and treatment, yet the resort tried to stay open without full safety patrols, producing severe overcrowding.

76. The conspiracy hid itself by its own nature, with much of the telling data locked behind several-hundred-dollar paywalls that kept ordinary consumers from finding it. According to the Antitrust Actions, beyond that passive concealment, the Resort Conspirators took active steps to bury their conduct. Vail moved to keep competitively sensitive figures out of public view, teaming with the NSAA in 2017 to oppose the U.S. Forest Service's release of individual resorts' land-use fees, an objection a former Vail executive defended as necessary to stop "sensitive financial and commercial information from being discovered by its competitors."

**The Individual Defendants Knew of, or Consciously Disregarded, the Anticompetitive Conduct**

77. The Individual Defendants either knew, or turned a blind eye to facts establishing, that Vail was engaged in the illegal conduct. As shown above, Epic Pass and day-ticket pricing was the Company's dominant profit engine, at some 65% of lift revenue and 75% of visitation, placing it squarely inside the Board's oversight lane. The Company's own CEO claimed public credit, more than once, for the very pricing strategy at the center of the Antitrust Actions. The Company kept a written antitrust policy that named and barred the exact pricing signaling and competitor data-sharing later established, proof the hazard was recognized, identified, and foreseen inside Vail. Senior Company figures sat atop, and took part in the sensitive conversations convened by, the trade association that powered the conspiracy. Further, the Company joined the NSAA in affirmatively walling off competitively sensitive data from the public.

78. Despite that knowledge, and despite owning responsibility for the Company's mission-critical pricing function, the Individual Defendants never put in place or enforced controls adequate to hold Vail to the antitrust laws or to its own Code, and instead let the conduct now challenged in the Antitrust Actions run its course. In the alternative, controls for oversight were in place and the Board ignored the red flags sent its way. The direct and proximate result is that Vail now faces treble-damage liability, injunctive relief up to divestiture, and serious reputational and financial harm.

## VAIL NOW FACES ANTITRUST LAWSUITS

79. The conduct described above has already produced consequences for the Company. In 2026, Vail was named as a defendant in the Antitrust Actions. Both actions were filed in this District, each attacking the Company's pricing of ski passes and lift tickets and each seeking treble

damages and injunctive relief that could reach the structure of the Company's business.

80. On March 23, 2026, four skiers filed the *Goloja* Action, naming Vail and Alterra as defendants, on behalf of a nationwide class of consumers who bought, since March 23, 2022, a Mega Pass (Epic and/or Ikon passes) or a covered lift ticket directly from the defendants. The *Goloja* Action complaint alleges that Vail holds market power over lift access to Destination Ski Resorts and uses the Epic Pass to force consumers into all-or-nothing bundles that also require paying for access to Regional Ski Areas they do not want. To drive those bundle purchases, the Company allegedly sets single-day lift-ticket prices at punitive, supracompetitive levels, a penalty price defendant Katz conceded was set "intentionally" high to push customers to buy Epic Passes.

81. The *Goloja* Action asserts three counts against Vail. First is violation of section 1 of the Sherman Act, Unlawful Bundling. The Epic Pass functions as an anticompetitive bundle tying lift access at Vail's Destination Ski Resorts (tying product) to access at its Regional Ski Areas (tied product). Vail has market power in the tying market sufficient to restrain trade in the tied market; and the bundling raises prices, forecloses independent Regional Ski Areas, and degrades quality. Second is violation of section 6-4-104 of the Colorado Act, Unlawful Bundling. The same bundling theory under Colorado law, seeking treble damages, fees, and injunctive relief. Third, unjust enrichment against Vail. Vail charged supracompetitive prices, knowingly accepted the resulting benefit, and cannot in equity retain it. The *Goloja* Action plaintiffs seek disgorgement into a common fund or constructive trust, or a refund of overpayments.

82. On August 5, 2026, three skiers filed the *Green* Action, naming six defendants: Vail, its competitors Alterra, Boyne, and Powdr, plus the NSAA and RRC, on behalf of a nationwide class of consumers who from January 1, 2020 through the present bought Destination

Ski Packages directly from any resort defendant. The *Green* Action complaint alleges that, beginning no later than January 2020, Vail and its competitors, enabled by the NSAA and RRC, knowingly exchanged confidential revenue, cost, capacity, and pricing data and used it to fix, raise, maintain, and stabilize the prices of Destination Ski Packages, producing parallel and substantial price increases across passes, lift tickets, rentals, and lessons. The claims arise under sections 1 and 3 of the Sherman Act, with relief sought under sections 4 and 16 of the Clayton Act.

83. The *Green* Action asserts both of its counts against Vail. Count one against Vail is for the conspiracy to restrain trade. No later than January 1, 2020, Vail and its co-defendants entered a continuing conspiracy to eliminate competition in the pricing of Destination Ski Packages, implemented by sharing confidential data through the NSAA and RRC and retaining RRC to guide their pricing. Pleaded as a *per se* violation, the *Green* Action plaintiffs seek Clayton Act damages and an injunction. Count two against Vail is for Unlawful Information Exchange, sections 1 and 3 of the Sherman Act. Vail and its co-defendants agreed to exchange competitively sensitive, non-public information to raise, fix, maintain, or stabilize prices. According to the *Green* Action, the resort conspirators collectively hold at least an 81% share of the Destination Ski Resort market and thus possess market power, seeking damages and injunctive relief.

84. The Antitrust Actions place substantial, overlapping exposure on Vail. Both demand treble damages on behalf of nationwide classes and both seek injunctive relief reaching the Company's core pricing practices and, potentially, its ownership of resorts through divestiture. The Company must now defend the Antitrust Actions arising from the same central feature of its business, the pricing of the Epic Pass and its lift tickets, which is the very conduct the Individual Defendants had a duty to monitor and to keep Vail compliant with antitrust laws.

## THE MATERIALLY FALSE AND MISLEADING 2024 PROXY

85. On October 23, 2024, Vail filed the 2024 Proxy with the SEC that contained material misstatements and omissions. The 2024 Proxy called for the Company's stockholders to vote to approve the 2024 Plan.

86. The 2024 Plan was not a matter of indifference to the Individual Defendants. Under the 2024 Plan, the Company's non-employee directors and its officers, including Executive Chairperson and director defendant Katz, were eligible to receive, and did receive, equity compensation. The 2024 Proxy disclosed that "approximately 12,900 employees, and all of the Company's non-employee directors, are eligible to participate in the 2024 Plan," and reserved 1,500,000 shares for issuance thereunder. Approval of the 2024 Plan thus authorized the equity awards through which the Individual Defendants would be compensated.

87. The 2024 Proxy also stated that the 2024 Plan is a mechanism that would tie the Individual Defendants' compensation to the Company's actual performance. The Board represented that "the adoption of the 2024 Plan is in the best interests of stockholders and the Company because cash- and equity-based awards help to attract, motivate, and retain talented employees, directors, and other service providers, align employee and stockholder interests, ***link employee compensation with performance***, and maintain a culture based upon employee stock ownership." The 2024 Plan, attached to the 2024 Proxy as Appendix B, similarly represented that its purpose was to "increase shareholder value" by motivating individuals "upon whose judgment, initiative, and efforts the continued success, growth, and development of the Company is dependent." The Compensation Discussion and Analysis section reinforced this theme, representing that Vail's "executive compensation program is designed to align the interests of our

executives with those of our shareholders by linking a significant portion of their compensation to the achievement of specific performance goals," and that the Compensation Committee's stated objective was to "[e]mphasiz[e] pay-for-performance by tying annual and long-term compensation incentives to achievement of specified performance objectives or overall stock performance." The 2024 Proxy further represented that the 2024 Plan was "intended to advance the interests of the Company and its stockholders."

88. These representations were materially false and misleading because the 2024 Plan expressly permits performance-based awards keyed to Resort Reported Earnings Before Interest, Taxes, Depreciation, and Amortization ("EBITDA"), segment-level EBITDA, revenue, net income, and total stockholder return—the very financial metrics that the antitrust conspiracy artificially inflated.[9] By representing that the 2024 Plan would reward the Individual Defendants for genuine Company performance and stockholder value creation, while concealing that the antitrust conduct described herein was distorting the very metrics used to measure and compensate that performance, the Individual Defendants caused Vail's stockholders to approve a compensation structure that in fact rewarded the Individual Defendants for supracompetitive results achieved through unlawful means.

89. To assure stockholders that the fiduciaries who would be compensated under the 2024 Plan were operating lawfully and ethically, the 2024 Proxy touted the Company's Code. The 2024 Proxy represented that the Company had "adopted a Code of Ethics that applies to all

---

[9] *See* 2024 Proxy, App. B §5(f)(ii), at 109 (performance criteria include "reported EBITDA results for the Company's mountain segment," "reported EBITDA results for the Company's lodging segment," "reported EBITDA results on a resort basis," "revenue," "net income," and "total stockholder return").

directors, officers, and employees," and conveyed the Company's "expectation that every director, officer, and employee read and understand the Code of Ethics and its application to the performance of each such person's business responsibilities." The 2024 Proxy specifically identified "antitrust and fair competition" as one of the subjects governed by the Code under the heading "Fairness and ethics in business dealings." The 2024 Proxy further represented that the Company required its employees to complete an annual Code training, and that "[i]n fiscal 2024, the training was completed by 98% of this employee base."

90. The 2024 Proxy also assured stockholders that the Board and its Audit Committee were actively overseeing the Company's compliance with law and its management of risk. The 2024 Proxy represented that "oversight of the Company's overall risk management program is the responsibility of the entire Board," that the Board "has delegated the regular oversight of the elements of the risk management program to the Audit Committee," and that "the Board receives periodic updates on individual areas of risk." The 2024 Proxy represented that the Audit Committee was charged with "oversee[ing] management's efforts to monitor compliance with the Company's programs and policies designed to ensure adherence to applicable laws and regulations and the Company's Code of Ethics."

91. The foregoing statements in the 2024 Proxy were materially false and misleading. At the time the Company solicited stockholder approval of the 2024 Plan, the Company and its fiduciaries were engaged in the ongoing antitrust conspiracy described herein, under which the Company exchanged confidential, competitively sensitive information with its horizontal competitors through the NSAA and RRC and used that information to fix, raise, maintain, and stabilize the prices of its Destination Ski Packages. That conduct was the precise conduct the Code

prohibited, as the Company's own policy barred "signaling future lift ticket or season pass pricing" and the exchange of pricing information with competitors "no matter how innocent or casual." The 2024 Proxy's representations that the Company's fiduciaries were expected to comply with, and were complying with, the Code, and that the Board and Audit Committee were monitoring compliance with applicable laws, were therefore false and misleading.

92. The 2024 Proxy's representations regarding the purpose of the 2024 Plan were likewise materially false and misleading. The 2024 Proxy represented that the Plan would "align employee and stockholder interests" and "link employee compensation with performance." In truth, the equity compensation authorized by the 2024 Plan rewarded the Individual Defendants for Company performance that was inflated by the unlawful antitrust conduct. Since the pricing of the Epic Pass and lift tickets generated the substantial majority of the Company's revenue, the pricing was the direct product of the conspiracy. Rather than aligning the interests of the Company's fiduciaries with those of its stockholders, the 2024 Plan enriched the Individual Defendants while they were breaching their fiduciary duties and exposing the Company to antitrust liability.

93. The 2024 Proxy was also materially false and misleading because it failed to disclose material adverse facts necessary to make its statements not misleading. Specifically, the 2024 Proxy failed to disclose that: (i) the Company was engaged in the antitrust conspiracy described herein, in violation of the antitrust laws and the Company's own Code; (ii) the Board's and the Audit Committee's oversight of legal compliance and risk were inadequate, in that they failed to monitor, detect, or halt the antitrust conduct; and (iii) as a result of the foregoing, the Company faced a substantial and undisclosed risk of antitrust litigation, treble-damage liability,

and reputational harm.

94. Moreover, by choosing to speak about the Board's oversight of the Company's legal compliance and risk management, the Individual Defendants were also required to disclose material trends or events that could impact the Company's operations. The ongoing antitrust conspiracy, and the attendant risk of antitrust enforcement and private litigation seeking treble damages and injunctive relief that could reach the Company's core pricing practices, was such a known trend or uncertainty. The Individual Defendants failed to disclose it.

95. As a result of the materially false and misleading 2024 Proxy, the Company's stockholders voted to approve the 2024 Plan, thereby authorizing the equity compensation under which the Individual Defendants were enriched while breaching their fiduciary duties to the Company. The Company was damaged by the Individual Defendants' material misrepresentations and omissions in the 2024 Proxy.

## DAMAGES TO VAIL

96. As a result of the Individual Defendants' breaches of fiduciary duty described above, Vail has suffered, and will continue to suffer, significant damages arising from both the antitrust conduct and the materially false and misleading 2024 Proxy detailed herein.

97. Vail now faces substantial monetary and injunctive exposure in the Antitrust Actions. Both actions seek treble damages on behalf of nationwide classes under the Sherman Act, the Clayton Act, and, in the *Goloja* Action, the Colorado Act, exposing Vail to potentially enormous monetary liability for the very anticompetitive conduct the Individual Defendants had a duty to prevent. Both actions further seek injunctive relief reaching the structure of Vail's business, including remedies as severe as divestiture, threatening to unwind the market position

and resort holdings the Individual Defendants spent decades assembling.

98. Vail has incurred, and will continue to incur, substantial costs defending the Antitrust Actions, including attorneys' fees, expert fees, and the costs of any settlement or judgment. These costs flow directly from the Individual Defendants' failure to ensure Vail's compliance with the antitrust laws and with the Company's own Code, which expressly prohibited the price signaling and competitor information exchange at issue in the Antitrust Actions.

99. The anticompetitive conduct has also degraded the very product Vail sells, damaging its reputation and goodwill within the business community. The parallel, supracompetitive pricing scheme left Vail's resorts overcrowded, understaffed, and beset by guest complaints, conditions serious enough to produce what guests dubbed the "lift line apocalypse" at Vail Mountain and labor unrest at Park City. This documented erosion in the guest experience represents a tangible injury to Vail's brand and to its standing with the very customer base whose loyalty is central to the Company's business model.

100. Vail was further damaged by the Individual Defendants' material misrepresentations and omissions in the 2024 Proxy. Vail's stockholders were induced to approve the 2024 Plan based on false assurances that the Company's fiduciaries were complying with the Code and that the Board and Audit Committee were adequately overseeing legal compliance and risk. As a result, the Individual Defendants were unjustly enriched with equity compensation under the 2024 Plan, compensation that rewarded them for Company performance inflated by the antitrust conspiracy, to Vail's detriment.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

101. Plaintiff brings this action derivatively in the right and for the benefit of Vail to redress injuries suffered, and to be suffered, by Vail as a direct result of violation of securities law, breach of fiduciary duty, and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants. Vail is named as a nominal defendant solely in a derivative capacity.

102. Plaintiff will adequately and fairly represent the interests of Vail in enforcing and prosecuting its rights.

103. Plaintiff was a stockholder of Vail at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is a current Vail stockholder.

104. The current Board of Vail consists of the following ten individuals: defendants Katz, Sewell, Schneider, Vaughn, Decker, Romanow, Rawlinson, Knobloch, and Chambers, and non-party William J. Hornbuckle. Plaintiff has not made any demand on the present Board to institute this action because such a demand would be a futile, wasteful, and useless act, as set forth below.

105. As alleged above, defendants Katz, Sewell, Schneider, Vaughn, Decker, Romanow, Rawlinson, Knobloch, and Chambers breached their fiduciary duties of loyalty and good faith by causing or permitting Vail to participate in the anticompetitive scheme described herein, in violation of the antitrust laws and the Company's own Code, and by soliciting the materially false and misleading 2024 Proxy that secured stockholder approval of the 2024 Plan. These are not exculpated exercises of business judgment. A decision to cause or permit the Company to violate the antitrust laws is a breach of the duty of loyalty for which the Individual Defendants may not be exculpated, and a claim under section 14(a) of the Exchange Act sounds in federal law and is

likewise not subject to exculpation.

106. Vail holds its fiduciaries to specific governance standards that track the requirements of the law. The Company's Code committed Vail to "full compliance with all laws, regulations, and Company policies that apply to our business," and included a dedicated "Antitrust and Fair Competition" section. Under that policy, the Company acknowledged that the antitrust laws forbid "[f]ix[ing] the prices or terms of sale for competing products (e.g., signaling future lift ticket or season pass pricing)," instructed that pricing and related information "cannot be exchanged or discussed with competitors, no matter how innocent or casual the exchange may be," and warned that "[t]here are no off-the-record discussions with competitors." The Company's own Code thus identified, and expressly prohibited, the precise pricing signaling and competitor information exchange at issue in the Antitrust Actions. The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations, the absence of good faith, and a reckless disregard for their duties to the Company.

107. The Director Defendants faced a mission-critical antitrust risk that they had a non-delegable duty to monitor and to keep within the bounds of the law. The pricing of the Epic Pass and lift tickets is the core of Vail's business, generating approximately 65% of the Company's lift revenue and approximately 75% of its visitation, and it is the exact subject of the Antitrust Actions now pending against the Company. The Director Defendants either knew that Vail was engaged in the anticompetitive conduct described herein and failed to halt it, or, in the alternative, consciously disregarded the red flags that the conduct generated, including the Company's own antitrust policy, the participation of the Company's senior leadership in trade-association gatherings and information exchange at the center of the conspiracy, and the Company's

affirmative efforts, alongside the NSAA, to conceal competitively sensitive data from the public. Either way, the Director Defendants face a substantial likelihood of liability, and demand upon them is futile.

108. Demand is separately excused because each of defendants Katz, Sewell, Schneider, Vaughn, Decker, Romanow, Rawlinson, Knobloch, and Chambers negligently solicited, or permitted the solicitation of, the materially false and misleading 2024 Proxy. Each of these defendants was a member of the Board that caused Vail to file the 2024 Proxy on October 23, 2024, and each solicited stockholder approval of the 2024 Plan on the basis of representations that were materially false and misleading. The representations included that the Company's fiduciaries were expected to comply with, and were complying with, the Code and its antitrust provisions; that the Board and the Audit Committee were adequately overseeing the Company's compliance with applicable laws; and that the 2024 Plan would "align employee and stockholder interests" and "link employee compensation with performance." As alleged above, those representations were false because, at the very time the 2024 Proxy was solicited, the Company and its fiduciaries were engaged in the ongoing antitrust conspiracy described herein, and the 2024 Plan in fact rewarded the Individual Defendants for supracompetitive performance achieved through unlawful means. The false and misleading 2024 Proxy secured stockholder approval of the 2024 Plan, damaging the Company. Each defendant who solicited it therefore faces a substantial likelihood of liability under section 14(a) of the Exchange Act, a claim that is not subject to exculpation, and demand upon each is futile.

109. Defendants Sewell, Vaughn, and Chambers, as members of the Audit Committee during the relevant period, bore heightened responsibilities that they failed to discharge. Under

the Audit Committee Charter, the Audit Committee Defendants were charged with overseeing the Company's compliance functions, its "legal and regulatory requirements," and the effectiveness of its enterprise risk management program, and with reviewing "the results of management's efforts to monitor compliance with the Company's programs and policies designed to ensure adherence to applicable laws and regulations, as well as to its Code of Ethics and Business Conduct." The Audit Committee Charter further empowered the Audit Committee Defendants to meet at least annually with the General Counsel, "who shall have the authority to communicate directly to the Committee, promptly, about actual and alleged violations of the Code of Ethics and Business Conduct, including any matters involving criminal or potential criminal conduct." Horizontal price fixing is a violation of the antitrust laws. Despite these specific duties, the Audit Committee Defendants failed to oversee the Company's compliance with the antitrust laws and with the Company's own antitrust policy; and reviewed and approved the materially false and misleading 2024 Proxy, which they knew or were reckless in not knowing contained improper statements and omissions concerning the Company's legal compliance and risk oversight. Accordingly, defendants Sewell, Vaughn, and Chambers face a substantial likelihood of liability for their breaches of fiduciary duty, and any demand upon them is futile.

110. Defendant Katz faces a substantial likelihood of liability that is greater still. Defendant Katz has been associated with Vail since 1992, has served as a director since 1996, and has served as the CEO since 2006. Defendant Katz is the architect of the Epic Pass and the aggressive pricing strategy at the center of the Antitrust Actions, and he claimed public credit for that strategy, telling the *New York Times* that "Vail's lift-ticket prices have been 'intentionally' aggressive" and that "[t]hey pushed customers to buy Epic Passes," and telling the *Wall Street*

*Journal* that the industry-wide transformation in lift-ticket pricing was one "that our company absolutely led." Defendant Katz cannot impartially consider a demand to sue himself for the very conduct he directed and publicly championed.

111. Defendant Katz is also incapable of impartially considering a demand because he lacks independence. His principal professional occupation is his employment with Vail, pursuant to which he has received and continues to receive substantial monetary compensation and other benefits, including compensation totaling $3,952,230 in fiscal 2025. Defendant Katz's interest in maintaining his executive position and the substantial compensation he receives in connection with it renders him incapable of impartially considering a demand to commence and vigorously prosecute this action against himself and his fellow directors. Demand is futile as to defendant Katz.

112. The Director Defendants are further disabled from impartially considering a demand because they were personally enriched by the very conduct a demand would challenge. Under the 2024 Plan approved through the false and misleading 2024 Proxy, each non-employee director and defendant Katz was eligible to receive, and did receive, equity compensation. Each of the Director Defendants therefore received a material personal benefit from the challenged transaction, and a demand that Vail sue to disgorge that compensation and to remedy the wrongdoing that inflated the performance metrics on which it was based would require these defendants to act against their own financial interests. This disabling interest independently excuses demand.

113. For each of the foregoing reasons, at least half of the members of the current ten-member Board face a substantial likelihood of liability for the misconduct alleged herein, received

a material personal benefit from the challenged transaction, or lack independence from those who did. Demand on the Board is therefore excused as futile.

## COUNT I

### Against the Individual Defendants for Violation of Section 14(a) of the Exchange Act

114. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

115. The section 14(a) Exchange Act claim alleged herein is based solely on negligence. It is not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants. The section 14(a) claim alleged herein does not allege and does not sound in fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to this non-fraud claim.

116. Section 14(a) of the Exchange Act, 15 U.S.C. §78n(a)(1), provides:

> It shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title.

117. SEC Rule 14a-9, promulgated pursuant to section 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

118. Under the direction of the Individual Defendants, the 2024 Proxy failed to disclose that: (i) though the Company represented that its officers and directors were expected to read, understand, and adhere to the Code, the Individual Defendants were, at the very time the 2024 Proxy was solicited, violating the Code's express prohibition on antitrust and fair competition violations by engaging in the price signaling and competitor information exchange described herein; and (ii) contrary to the 2024 Proxy's representations regarding the Board's and the Audit Committee's oversight of risk management and legal compliance, the Board and the Audit Committee were not adequately exercising these oversight functions and were causing or permitting the Company to engage in, and to fail to disclose, the ongoing antitrust conspiracy.

119. The 2024 Proxy also failed to disclose that: (i) the Company was engaged in the antitrust conspiracy described herein, in violation of the antitrust laws and the Company's own Code; (ii) the Board's and the Audit Committee's oversight of legal compliance and risk were inadequate, in that they failed to monitor, detect, or halt the antitrust conduct; (iii) as a result of the foregoing, the Company faced a substantial and undisclosed risk of antitrust litigation, treble-damage liability, and reputational harm; and (iv) rather than aligning the interests of the Company's fiduciaries with those of its stockholders and linking their compensation to genuine Company performance, as represented, the 2024 Plan would reward the Individual Defendants with equity compensation for performance that was inflated by the unlawful antitrust conduct.

120. In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2024 Proxy were materially false and misleading. The misrepresentations and omissions were material to plaintiff in voting on the matters set for stockholder determination in the 2024

Proxy, including the approval of the 2024 Plan.

121. The false and misleading elements of the 2024 Proxy led to the Company's stockholders' approval of the 2024 Plan, thereby authorizing the equity compensation under which the Individual Defendants were enriched while breaching their fiduciary duties to Vail. The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2024 Proxy.

122. Plaintiff, on behalf of Vail, has no adequate remedy at law.

## COUNT II

### Against the Individual Defendants for Breach of Fiduciary Duty

123. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

124. The Individual Defendants owed and owe Vail fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed and owe Vail the highest obligation of care and loyalty.

125. Each of the Individual Defendants violated and breached their fiduciary duties of candor, good faith, loyalty, and reasonable inquiry, causing the Company to engage in the misconduct described herein.

126. The Individual Defendants had actual or constructive knowledge that the Company was participating in an antitrust scheme to raise lift ticket prices, and they failed to bring the Company into compliance with antitrust laws. The Individual Defendants either had actual knowledge of the misrepresentations and omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and disclose such facts, even though

such facts were available to them. Such material misrepresentations and omissions were committed knowingly, recklessly, and for the purpose and effect of having stockholders approve the 2024 Plan.

127. The Individual Defendants failed to correct or caused the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact described herein, rendering them personally liable to the Company for breaching their fiduciary duties.

128. The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by allowing the Company to engage in the antitrust scheme. These actions could not have been a good-faith exercise of prudent business judgment to protect and promote the Company's corporate assets.

129. The Audit Committee Defendants breached their fiduciary duty of loyalty by approving the 2024 Proxy, which was made during their tenure on the Audit Committee, which they knew or were reckless in not knowing contained improper statements and omissions. The Audit Committee Defendants failed to appropriately oversee the Company's compliance with antitrust laws.

130. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Vail has sustained significant damages, as alleged herein. As a result of the misconduct alleged herein, these defendants are liable to the Company.

131. Plaintiff, on behalf of Vail, has no adequate remedy at law.

## COUNT III

**Against the Individual Defendants for Unjust Enrichment**

132. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

133. By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Vail. The Individual Defendants were unjustly enriched as a result of the compensation and director remuneration they received while breaching fiduciary duties owed to Vail.

134. Plaintiff, as a stockholder and representative of Vail, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

135. Plaintiff, on behalf of Vail, has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff, on behalf of Vail, demands judgment as follows:

A. Against all of the defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the defendants' violations of securities laws, breaches of fiduciary duties, and unjust enrichment;

B. Directing Vail to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Vail and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote, resolutions for amendments to the Company's Bylaws or

Articles of Incorporation and taking such other action as may be necessary to place before stockholders for a vote of the following corporate governance policies:

1. a proposal to strengthen the Board's oversight of legal and regulatory compliance, including with respect to antitrust and competition laws;

2. a provision to control and limit compensation and equity awards to executives and directors whose performance metrics may be impacted by undisclosed legal or regulatory risk;

3. a provision to ensure the establishment and enforcement of effective internal controls designed to ensure compliance with the Company's Code, including its antitrust and fair competition provisions;

4. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater stockholder input into the policies and guidelines of the Board;

5. a provision to permit the stockholders of Vail to nominate at least three candidates for election to the Board; and

6. a proposal to strengthen Vail's oversight of its disclosure procedures;

C. Extraordinary equitable and injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiff on behalf of Vail has an effective remedy;

D. Awarding to Vail restitution from defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the defendants, including

any equity awards granted under the 2024 Plan, obtained by the Individual Defendants as a result of their wrongful conduct and breaches of fiduciary duty;

E. Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F. Granting such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury.

Dated: August 24, 2026

Respectfully submitted,

/s/ Jeffrey A. Berens
Jeffrey A. Berens
**JOHNSON FISTEL, PLLP**
2373 Central Park Boulevard, Suite 100
Denver, CO 80238-2300
Telephone: (303) 861-1764
E-mail: jeffb@johnsonfistel.com

Michael I. Fistel, Jr.
40 Powder Springs Street
Marietta, GA 30064
Telephone: (470) 632-6000
E-mail: michaelf@johnsonfistel.com

Brian J. Robbins
Stephen J. Oddo
Michael J. Nicoud
**ROBBINS LLP**
5060 Shoreham Place, Suite 300
San Diego, CA 92122
Telephone: (619) 525-3990
Facsimile: (619) 525-3991
E-mail: brobbins@robbinsllp.com
soddo@robbinsllp.com
mnicoud@robbinsllp.com

*Attorneys for Plaintiff Gary Peterson*

# VERIFICATION

I, Gary Peterson, hereby declare as follows:

I am the plaintiff in this action. I have read the verified stockholder derivative complaint. Based upon discussions with and reliance upon my counsel, and as to those facts of which I have personal knowledge, the complaint is true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Signed and Accepted:

Dated: 8/22/2026

Signed by:
Gary Peterson
2F89479105BE420...
GARY PETERSON